694 So.2d 686 (1997)
William VAN POYCK, Appellant,
v.
STATE of Florida, Appellee.
No. 84324.
Supreme Court of Florida.
March 27, 1997.
Rehearing Denied May 27, 1997.
*688 Jeffrey O. Davis, Mitchell S. Moser and Ronni M. Flannery of Quarles & Brady, Milwaukee, WI, for Appellant.
Robert A. Butterworth, Attorney General and Celia A. Terenzio, Assistant Attorney General, West Palm Beach, for Appellee.
PER CURIAM.
William Van Poyck appeals an order entered pursuant to Florida Rule of Criminal Procedure 3.850, in which the trial court denied all relief. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed, we affirm the denial of Van Poyck's motion for postconviction relief.

Facts
The facts of this case are detailed in our decision, reported in Van Poyck v. State, 564 So.2d 1066 (Fla.1990), affirming Van Poyck's convictions and sentences. In summary, the relevant events unfolded as follows. On June 24, 1987, state inmate James O'Brien was transported to the office of a dermatologist by two corrections officers. Officer Griffis drove the van and was unarmed. Officer Turner was responsible for watching O'Brien, the two separated by a cage. Upon arriving at the dermatologist's office, Officer Turner turned his eyes downward looking for paperwork. When Turner looked back up, he saw Van Poyck, who had approached the van, aiming a gun at his head. Officer Turner was forced out of the van and ordered to crawl underneath the vehicle. While Officer Turner was getting under the van, Frank Valdez, one of Van Poyck's accomplices, was approaching the driver's side of the van. Officer Turner, from underneath the van, saw Officer Griffis forced out of the van and taken to the back of the vehicle. Then, while noticing two sets of feet near the back of the van, he heard the gunshots that killed Officer Griffis. Officer Turner did say, however, that he was unable to testify as to Van Poyck's location when the shooting occurred. Officer Griffis was shot three times, once with the barrel of the gun placed to his head.
Van Poyck was tried and convicted for first-degree murder, attempted first-degree murder, aiding in an attempted escape, aggravated assault, and six counts of attempted manslaughter. By a vote of eleven to one, the jury recommended that the penalty of death be imposed. The trial judge followed the jury's recommendation and sentenced Van Poyck to death. On direct appeal, Van Poyck raised six guilt-phase issues and fifteen penalty-phase issues. This Court, in our initial opinion, found the evidence could not sustain the conviction of premeditated murder but upheld the first-degree murder conviction on the theory of felony murder. After that pronouncement, we rejected or found harmless all other claims and affirmed Van Poyck's convictions and sentences.
Van Poyck then filed a motion to vacate his convictions and death sentence, pursuant to rule 3.850, on December 8, 1992. A substantial evidentiary hearing was held on multiple issues after which the lower court denied all relief.
*689 In his appeal of that order, Van Poyck raises sixteen claims. We find that none warrant relief. Accordingly, we affirm the lower court's order.

Ineffective Assistance of Penalty-Phase Counsel
Van Poyck's first two claims center around the representation he received at the penalty-phase proceeding. He argues that his counsel was ineffective. We disagree. Further, he asserts that the lower court inappropriately limited his ability to prove the ineffective nature of his penalty-phase representation by refusing to reopen the evidentiary hearing or to supplement the record when an affidavit became available after the close of the proceedings. We also find no merit in this assertion.
Van Poyck's claim of ineffective penaltyphase representation is based on the allegation that his trial counsel, Cary Klein, failed to adequately investigate mitigating evidence of Van Poyck's problematic life and mentalhealth histories. The two-prong standard for evaluating an ineffective assistance of counsel claim, set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), requires: (1) that the defendant first demonstrate deficient performance by counsel; and (2) that the defendant then demonstrate that such deficient performance caused prejudice. Based on the record in this case, Van Poyck has not demonstrated deficient performance by his counsel.
At the outset, it must be understood that Van Poyck argues two distinct areas of deficiency. He argues that Klein should have investigated, discovered, and presented both his life history and his mental-health history. As to his claim regarding deficient investigation and presentation of mentalhealth evidence, we find that Klein had clear tactical reasons for avoiding such a line of argument. The following testimony from Klein at the evidentiary hearing below illuminates Klein's tactical considerations:
Q: [By prosecutor Geesey]:
During the course of your representation of this defendant, you've indicated that you obtained his jail records. Were you referring to Department of Corrections records?
A: Yes.
Q: When did you obtain those records and
A: I don't recall exactly the date. It was fairly early on in the representation. I would say sometime by late fall we had gotten his DOC records or sometime by the winter.
Q: Why did you want his DOC records?
A: We sent away for his Department of Correction records because he had spent the last 15 or so years in the Department of Corrections. From the time he was 17 or so until maybe 6 months before the crime happened, that's where all of his time was spent. The Department of Corrections also had all of his mental health records from the time he was in DOC so we would need those, also.
One of the things we were looking for, and this was a suggestion of Mr. Van Poyck's, if he had a decent prison record or there were some people willing to testify that he could be a model prisoner, that might be a mitigating circumstance, a jury believing that he could be a model prisoner in the prison system might be willing to let him spend the rest of his life in the prison system so we sent away for those prison records.
The prison records also had his prior crimes, prior convictions, some of the judgments in them. It would have a lot of things we would need to help us prepare primarily for phase two but even, to some degree, for phase one. If we decided to have him testify, we'd need to know what convictions he had. That would be in Department of Corrections records.
Q: Obviously well may have.
Have you reviewed your time sheets and your billing from back in `87 and `88 recently?
A: No, I haven't, not since I submitted the bill on the case which was probably 4 to 6 months after the trial was over.

*690 Q: Did you have any recollection of approximately how many hours you spent reviewing those DOC records?
A: I could only estimate. It had to take at least 10 hours. It took the better part of two complete days to get through most of the records and that's even with skimming some of them.
Q: And in those records, you were looking for what type of evidence, specifically?
A: I was looking for, specifically, mental health records. I wanted to see what happened in the mid `70's, why he waswhy he was sent to Chattahootchee, what the diagnosis was, the prognosis, why he came back.

I was looking also, very specifically, for whether I could get anything out of his prison records that would be mitigating in terms of him being a model prisoner, a good prisoner. Specifically, that is really the two specific things we were looking for.
Q: First of all, did you find anything in those records that would give you evidence that he was a model prisoner and that you could perhaps use as a non statutory mitigating circumstance?
A: No, I didn't find anything that was really helpful in that regard.
Q: And, in fact, was it fairlyhow would you describe the number of disciplinary reports and the type of offenses he committed for those?
A: Well, he had several D.R.'s. He had quite a number of them. Obviously, he had done a lot of fighting in prison.
Q: Were there any weapon offenses for the D.R.'s?
A: I think there were one or two weapon offenses. He had had some escapes, also.
Q: Did you see anything in those records that you could use to establish a nonstatutory mitigating circumstance?
A: At one point I thought that I could take at least the 5 years of his prison record and use some of that because it got progressively better as he was there. The first 10 years or so he was in prison, it was horrible. As I guess he learned how to play the system, it got better but even in the last 5 years, I think he got one or two D.R.'s. I didn't think we could use any of that without having the previous 10 years come in from the State to make it look even worse than it was.
Q: You felt that it couldn't be done without opening the door?
A: Right.
....
Q: From your review of those records, did you believe that there was anything in there that would be of assistance in a penalty phase?
A: I thought the fact that he had been in Chattahootchee and the previous mental health encounters would be of some mitigating or might be of some mitigating use in phase two.

Q: At some point in time was there a decision made not to use that evidence?

A: Yes.

Q: When was that decision made?

A: Well, initially, the decision was made. Although it wasn't hard and fast, I was inclined not to use them. When I spoke to Mr. Van Poyck he explained to me that he had faked some of the brief mental illness. He faked the light bulb incident and we had a good laugh over that. And I probably would have used it, notwithstanding, if I had gotten some help later on from some mental health experts that perhaps he was, notwithstanding what he told me, he was still mentally ill.
Q: When did the defendant tell you that he had faked some of his mental health history and faked the incident with the light bulb?

A: Well, I'm trying to remember the first time it came up. I think the first time it came up I'm not sure Mike [cocounsel Dubiner] was even appointed. Actually, I think he was appointed, which meant it was probably the summer of `88. It was probably either late spring or summer of `88.

After Mike Dubiner was appointed, we had a conversation in the jail. He had told me that he denied that he was really sick in the `70's and he told me he had like *691 made it all up to get out of the prison population to go to Chattahoochee.

Q: When the defendant told you this, did you question in your own mind whether or not he was being truthful with you?
A: Initially, no, I don't think I really questioned it. I think I accepted what he was telling me. He went into detail. I mean, he wasn't delusional, at the time. He had a pretty good recall of most of the facts and fairly decent sense of humor about the incident. He understood the circumstances, at the present time. What I did have is doubts, not about his truthfulness but I had doubts about why he was telling me that.
Q: Were you concerned about that?
A: Yes, I was pretty
Q: Let's go specifically into what the defendant told you in the summer of `88 about his faking.

First of all, did the defendant say anything about any preparation before he began faking this mental illness?
A: He told me that he had gone to the prison library and looked up some books on schizophrenia and mental illness, had done extensive reading on it in preparation for this charade.

Q: How long did he tell you that he had spent preparing and reading and studying for all of this?
A: He didn't tell me how long. I don't recall if he told me specifically how long but I got the impression he was fairly wellif he was telling me the truth, that he had prepared pretty well for it because he fooled the doctors, obviously, at Chattahoochee at Florida State Hospital.
Q: Did the defendant say how he was able to obtain these materials, read and study these materials? Did that seem consistent with his cognitive ability that he demonstrated to you in his legal research?
A: It did. It was probably one of the reasons I probably believed him without much doubt, yes.
Q: And what did he say, specifically, about how he faked the mental history?

A: I think he explained to me how he made it appear that he was chewing on this light bulb.

Q: What did the defendant say about that?

A: I think he said he put something in his mouth that made a crunch or something like that and they were convinced he was eating a light bulb.

Q: Did he have light bulb parts?

A: Yes, he was like spitting out the little metal pieces. He didn't go into great detail about it but it was enough to convince me that he had pulled a little sleight of hand on them.

....
Q. Did you want to open the door to any evidence of the defendant's escape or attempted escape while incarcerated on other charges earlier in his life?
A. No.
Q. Did you think that would have a detrimental effect in seeking a life recommendation from the jury?
A. Clearly that would've had a detrimental effect. We did not want the jury to know this was not a person who could be trusted for life in prison.
Q. Earlier on defense counsel showed you State's Exhibit Number 2 and that it was a report of the defendant in 1977 stating that he had expected to end up on death row someday and he would not hesitate to destroy a snake in a brown shirt. Is that information that you would have wanted to come in front of a jury in a penalty phase?
A. No, I don't think so.
Q. Would you want to do anything to call attention to that document on the part of the prosecutor?
A. No.
Q. Also, in cross examination, the defense counsel asked you about the five years aggravation in the defendant's parole in 1980 because of his mental health history. That took place in 1980; correct?
A. Yes, and it was litigated for a number of years thereafter.

*692 Q. After that occurred in 1980, was there any additional evidence of mental disturbance on the part of the defendant?
A. No.
Q. He was cured from that point on?
A. As far as I know he was mentally healthy for the remainder of the 80's.
Q. Concerning the issue of voluntary intoxication, was that successful for the codefendant?
A. No.
Q. Did you think it was a viable defense for your client?
A. No.
(Emphasis added.) This extended excerpt demonstrates that Klein had quite adequate reasons for limiting his use of the prison records and thereby limiting the presentation of Van Poyck's mental-health history. Further, Klein testified that Dr. Villalobos, after examining Van Poyck prior to the penalty phase, reported that Van Poyck was a sociopath. Indeed, Klein testified that Dr. Villalobos asked not to be called as a witness because his findings would not be helpful. This information only strengthens Klein's tactical choice. While we acknowledge that Klein's co-counsel Dubiner testified that they were unprepared for the penalty-phase proceeding and, in his opinion, should have spent more time preparing mental-health evidence for presentation, we will not second-guess Klein's clearly tactical choice. See Cherry v. State, 659 So.2d 1069, 1073 (Fla.1995)(concluding that present counsel's disagreements as to strategy does not necessarily satisfy Strickland because standard is not how present counsel would have, in hindsight, proceeded).
As to Klein's choices regarding the presentation of Van Poyck's life history during the penalty-phase proceeding, we likewise find no error. Evidence of Van Poyck's life history was adequately presented by Klein at the penalty-phase proceeding.[1] Indeed, the jury was actually aware of most aspects of Van Poyck's life that he now argues should have been presented. Klein testified to the following in the evidentiary hearing below:
Q: Did you ask the defendant any questions to try and find out what you could do in a penalty phase?
A: We discussed it constantly, constantly. He was very up on it.
Q: What kind of questions?
A: I asked him who I could contact, who I could call, who were your friends when you were kids? I didn't have any. Tell me about your family. Well, the only one still in contact is my stepmother and my brother, so on and so forth. I don't mean to tell you that he was directing what to do but he had a tremendous input, being intelligent and knowing the mitigating circumstances, both statutory and nonstatutory. We considered like a list of 18I think it was 15, 16, 18 nonstatutory mitigating circumstances.
In fact, I put them up in closing argument in phase two. I must have listed 12 or 13 nonstatutory [circumstances] that we could not actually prove other than the couple that we tried to prove that I suspected were there but none could we show.
Q: Did you ask the defendant if he had ever been raped?
A: We talked about that. He told me that he had not. He didn't have that many problems in jail; that he was able to take care of himself and they generally left him alone.
At the penalty-phase proceeding, defense testimony was presented by Deborah Chisholm, Jeffrey Van Poyck, Anne Van Poyck, Lee Van Poyck, and by Van Poyck himself. Chisholm was a nurse at the Palm Beach County Jail when she met Van Poyck. She testified that Van Poyck was a "very caring person, very friendly, very loving and very intelligent and somebody that I really enjoyed talking to." Further, she testified that Van Poyck had indicated to her that he did not kill Griffis and that he was sorry that the shooting had happened.
*693 Jeffrey Van Poyck is Van Poyck's brother. Klein testified that he made the tactical decision to call Jeffrey Van Poyck for the following reason:
One of the reasons why I called Jeff, I wanted Jeff to testify before the jury because I wanted these people to see that this was his only role model from the time he was a little baby. Jeff, who was his brother, I think was serving, at the time, I think a 40 year prison sentence for armed robbery.
You had to be there to listen to this guy's testimony. I think he was the most cold and chilling witness I had ever seen on the witness stand. As it turned out, I think the jury hated this guy, couldn't stand him. But I felt like we had to call him because if I had tried to explain to [the] jury what kind of role model or influence he was, they wouldn't have believed me. I thought they had to see Jeff for themselves to understand how chilling, cold an influence this person would've had on Bill. But again, we had no psychological underpinning for it.
Jeffrey Van Poyck testified to the facts surrounding his mother's death. The defendant was very young when his mother passed away. Jeffrey Van Poyck then testified that his father hired Ms. Dano to take care of both the house and the children (Jeffrey, William, and Lisa). She was a strict disciplinarian. Indeed, she beat the three children until their father fired her at gunpoint. At that point, Jeffrey Van Poyck testified, Aunt Phyllis moved into the house and cared for the three children. She remained as caretaker until the elder Van Poyck (their father) married Lee Hightower. Finally, Jeffrey Van Poyck extensively testified to his life in crime (500 burglaries, he claimed, prior to his first arrest) and the influence such an example could have had on the defendant.
Anne Van Poyck was the defendant's aunt. She gave insight into Aunt Phyllis. First, she testified that Phyllis may not have been the woman's real name. Second, she testified that the children's natural mother was named Phyllis. Third, she revealed that Aunt Phyllis told the children that she was their real mother. Finally, her testimony was that she was not impressed with Aunt Phyllis's ability as a surrogate mother and that she considered Aunt Phyllis to be an unstable person.
Lee Hightower Van Poyck is the defendant's stepmother. Her testimony provided insight into the personality of the defendant's father, Walter Van Poyck. She stated:
Well, first of all, he was a very good man. He was a very kind man, a very caring man.
As you probably know, he was disabled. He lost his leg in World War II in the Holland invasion.
Consequently, he was not with the children as active as an ordinary father would be. He was unable to do certain things with the children, but he was a good father.
....
Let me say this: Walt Van Poyck loved his family. He has difficulty demonstrating that love. He was not demonstrative but he was kind and he was gentle and he was caring, but he wasn't outgoing with his affection.
Lee Hightower Van Poyck also verified that Aunt Phyllis had grown up being called Amy but changed her name to Phyllis at some point. She also thought that Aunt Phyllis was unstable. Finally, she opined that Jeffrey Van Poyck had been a bad influence on the defendant.
Notably, defendant Van Poyck then testified to the following:
Q Mr. Van Poyck, you heard your mother testify today and you heard your brother testify about some remorse that you showed in writing some letters. If you would forget for a second whatever letters you may have written, Mr. Van Poyck, how do you feel about theabout your actions regarding the incident of June 24, 1987?

A Well, I take responsibility for the fact thatif I had not made a decision to free James O'Brien, Mr. Griffis would still be alive.

Q Mr. Van Poyck, you heard testimony about your brother, Jeffrey, and his *694 influence on you. You heard Jeffrey testify. Is it Jeffrey's fault that you are the way you are today?

A I can't say that, no, sir.

Q Why not?

A I happen to believe that people should be responsible for their own actions.

Q Do you consider yourself a fairly intelligent person?
A I would hope so.
(Emphasis added.) Clearly, Klein did an adequate job of presenting Van Poyck's life history. In sum, we conclude that Klein's performance was not deficient in presenting Van Poyck's mental-health and life histories. Indeed, Klein tactically avoided presenting (or opening the door to the presentation of) events severely disadvantageous to Van Poyck's cause. Accordingly, we find no merit to the claim that Van Poyck received ineffective assistance of counsel at the penalty phase of his trial.[2]
Van Poyck's second argument relating to his penalty-phase representation is that the court below erred in refusing to allow him to either supplement the record or to reopen the evidentiary hearing on the post-conviction motion. The purpose of such reopening or supplementation would be to secure the affidavit or testimony of Dr. Villalobos in relation to his conversations with Klein. Dr. Villalobos presumably denies making certain statements to Klein. As noted earlier, Klein testified that Dr. Villalobos told him that Van Poyck was a sociopath. Indeed, the lower court cited this fact to bolster its conclusion that Klein's decisions were part of a tactical plan. It now seems that Dr. Villalobos, if allowed, would deny making such a statement.
In evaluating the impact of the judge's action, we must look at the type of claim Van Poyck raises. The trial judge's denial of Van Poyck's motion to reopen or to supplement is only harmful to him if the refused material would be determinative of a valid claim. In this case, Van Poyck is trying to use Dr. Villalobos's testimony or affidavit to prove ineffective assistance of penalty-phase counsel. If such ineffective assistance of counsel could not be proven even with the additional testimony or affidavit, any error in refusing to reopen or supplement would be harmless.
We have already stated that the record, as currently comprised, demonstrates no penalty-phase deficiency by Klein. Would the testimony or affidavit of Dr. Villalobos change that? Two large assumptions would have to be made in order to contemplate such a change. First, it would have to be assumed that Dr. Villalobos's testimony or affidavit would be given more credibility and weight than Klein's testimony. Second, it would have to be assumed that Klein's tactical decision as to mental-health evidence is crippled if he truly received no information from Dr. Villalobos (as the doctor claims) instead of negative information (as Klein claims). It is not at all clear that either of these assumptions is valid. In the first instance, Klein's testimony is quite convincing. Indeed, there is scant evidence that Klein's testimony even came as a surprise to Van Poyck. In the second instance, it must be remembered that Klein testified that he was inclined to refrain from presenting mental-health evidence as mitigation unless a mental-health expert could actually say Van Poyck was mentally ill. Dr. Villalobos was not, by any account, prepared to make that statement. In fact, the affidavit signed by Dr. Villalobos (at issue in this particular motion) made no such affirmative claim. The affidavit reflects only that Dr. Villalobos had insufficient time to make any evaluation. Van Poyck attributes the insufficiency of examination time to Klein's deficient preparation. Even if Dr. Villalobos told Klein that he had insufficient time to offer any opinion, it is by no means certain that Klein would have been deficient *695 for making the tactical decision to refrain from presenting (thereby halting his search for a mental-health expert) mental-health mitigation. As we have already demonstrated, Van Poyck's prison records were full of unsavory information that Klein has testified he wanted to keep from the jury. With this said, though, we will grant, arguendo, that both assumptions outlined above are valid and that Dr. Villalobos's affidavit or testimony would prove Klein's penalty-phase performance deficient. In such an event, Van Poyck still has to demonstrate that he was prejudiced. He cannot do so because this record will not support such a conclusion.
Any mental-health evidence that might have been produced would have been severely undermined by the contents of Van Poyck's prison records. Those records included extensive documentation as to examinations and conclusions by prison doctors. On September 26, 1975, Van Poyck was presented to the Forensic Unit Staff Conference. The conference was attended by doctors Ogburn, Dachtera, and Mehta. Their final diagnosis was that Van Poyck suffered from "Personality Disorder, Antisocial Type with Paranoid Features." Then, on November 20, 1975, Dr. Margarita Gonzalez examined Van Poyck. She diagnosed Van Poyck with: (1) personality disorder, antisocial type with paranoid features; and (2) drug abuse, multiple. On February 26, 1976, Dr. Delfina Johnson examined Van Poyck and found no psychosis at the time. Once again, on May 27, 1983, Dr. Sotomayor evaluated Van Poyck and concluded that he did not "reveal any signs of psychosis." In fact, Van Poyck told Dr. Sotomayor that "[a]'int nothing wrong with me now. Am working and trying hard to behave myself." The following year, on June 6, 1984, another report was filed which found that "[s]ince Van Poyck exhibits an absence of any acute distress or mental disorder, treatment is not indicated and none is recommended." The prison records clearly contain an abundance of medical evidence indicating that Van Poyck's mental condition, if any, would not be mitigating in nature. Any testimony developed by the defense through mental-health experts would certainly be tempered by its inconsistency with the medical reports in the prison records. The records also contain the following information that would certainly be damaging to Van Poyck.
Over twenty prison disciplinary reports were filed against Van Poyck. Further, he had an attempted escape in his records. On that point, Klein specifically testified that he wanted to keep such information from the jury because of the negative impact it would have on seeking a life recommendation. The records also reflect that in March of 1977, Van Poyck was placed in administrative confinement after getting caught typing a letter to another inmate. In that letter he stated, "I know for a fact that I am going to end up on death row within a couple of years." He also stated, "I would not hesitate to destroy any snake in a brown uniform." It must also be remembered that Van Poyck admitted to Klein that he faked the light bulb incident. If Klein had proceeded to use the incident as mitigating in nature, he would have been faced with an ethical problem. He would have encountered a situation in which his duty of candor towards the court required the revelation of Van Poyck's admission. The problematic nature of such a predicament is obvious.
Even as we assume, arguendo, that Klein should have allowed more time for mentalhealth evaluations of Van Poyck by experts, it cannot be denied that the force of the above information would probably dwarf any expert testimony Klein might have secured. In the context of this case, there is no possibility that Van Poyck could demonstrate that "but for counsel's errors he would have probably received a life sentence." Hildwin v. Dugger, 654 So.2d 107, 109 (Fla.1995). In reaching this conclusion, we have taken into account the testimony offered by Dr. Robert T.M. Phillips. Dr. Phillips specifically opined that Van Poyck
is an individual who has suffered from what we would describe as a psychoactive substance abuse, organic mental disorder, which is a long winded, perhaps unnecessary saying, this is someone who has suffered from the ravages of alcohol and drug dependency and at the height of their dependency is most dysfunctional. *696 Dr. Phillips also opined that Van Poyck suffered from a schizo-affective disorder, a disorder described as being "not quite schizophrenia." We restate that, when considered in the context of the entire record, an isolated advantageous evaluation cannot be considered determinative.
In light of our finding that Van Poyck cannot demonstrate prejudice, the supplementation of the record or the reopening of the evidentiary hearing would not have led to a finding of ineffective assistance of penaltyphase counsel. An error, if any, in refusing to reopen or to supplement is consequently harmless beyond a reasonable doubt.

Ineffective Assistance of Guilt-Phase Counsel
We next address Van Poyck's claim that he was denied effective assistance of counsel at the guilt phase of his trial. Specifically, Van Poyck claims that his guiltphase representation was ineffective in the following ten ways: (1) by failing to demonstrate that Van Poyck was not the triggerman; (2) by failing to impeach the testimony of Officer Turner; (3) by failing to present a voluntary intoxication defense; (4) by failing to pursue a motion to change venue; (5) by failing to adequately conduct voir dire; (6) by conceding the underlying felonies of robbery and escape; (7) by failing to preserve a Batson[3] violation; (8) by allowing a shift in the burden of proof; (9) by allowing Van Poyck to take a large role in trial preparations; and (10) by failing to object to prejudicial statements by the prosecutor. More generally, Van Poyck also complains that the court below erred in summarily denying certain claims, thereby denying him a full and fair hearing. We disagree. We affirm the trial court's denial of all relief on this issue. Prior to addressing any of the individual areas of concern as to guilt-phase representation, however, we point out the following insightful testimony offered by Van Poyck's trial cocounsel (Michael Dubiner, now a key Van Poyck witness) at the evidentiary hearing below:
Q: You testified on direct that this was a loser in guilt phase. Is that still your opinion today?
A [Dubiner]: No question about it.
....
Q: There were numerous witnesses who identified the defendant as being involved in the escape attempt, isn't that correct?
A: Yes.
Q: The murder weapon was found in the vehicle where the defendant was eventually arrested with Valdes, correct?
A: That's correct.
Q: Officer Turner's weapon that was taken from him during the commission of this crime was found in that motor vehicle, correct?
A: That's correct.
Q: There's never an identity issue as to whether the defendant was involved in that escape attempt, identity was never in issue?
A: No.
Q: Would anything have changed the outcome of that guilt phase?
A: No. I think that the strong likelihood is that any defense that was presented in Phase I would have led to a firstdegree murder conviction.
Surely this testimony from a defense witness militates towards a finding that Van Poyck could not have suffered prejudice under the second prong of Strickland. Dubiner's testimony is reinforced by the statements, on cross-examination, of another defense witness (at the evidentiary hearing below), Carey Haughwout. She stated:
Q: My question is very specifically to the guilt phase of that trial, is there a viable defense?
A: No, I don't believe that there is a defense that would have resulted in an acquittal, no.
Q: There is no voluntary intoxication defense?
A: Not that would have resulted in an acquittal, no.

*697 Q: There is no insanity defense for the guilt phase?
A: Not that would have resulted in an acquittal.
Q: There's no defense of any kind to the guilt phase?
A: That'sI think that's what I said before, yes.
Our review of the record confirms the opinions expressed by both Dubiner and Haughwout. Even if trial counsel were, arguendo, deficient at the guilt phase, Van Poyck was not prejudiced by any of those mistakes. We stress, however, that we find few deficiencies. For instance, Klein clearly had tactical reasons for limiting his presentation of evidence that might indicate a triggerman other than Van Poyck. Klein testified at the evidentiary hearing below that he did not want to give up his "sandwich." In other words, he did not want to lose the opportunity of giving two closing arguments at the guilt phase. To that end, he stated the following:
Q: Was therewhen you talked about the fact that it was important to save the sandwich, you're talking about the ability for the defense to argue first and last if there's no evidence offered aside from the testimony of the defendant?
A: Yes.
Q: Was that significantly important to you, sir?
A: It was. It was very important to both Mr. Dubiner and myself.
Q: Do you place an importance of argument over evidence?
A: Generally, no, I don't. But I thought in this case it was very important to have the opening salvo and the closing salvo.
Q: Was argument an important portion of Mr. Van Poyck's capital case for the defense?
A: Yes.
Q: How important?
A: Argument?
Q: Yes.
A: Since we didn't have any exculpatory evidence, I would say it was crucial.
We find it clear that Klein had sufficient tactical reasons for refraining from the presentation of further direct evidence (in the form of DNA tests and receipts from a gun shop) as to the triggerman's identity.
Van Poyck also alleges that Klein was deficient in his cross-examination of Officer Turner, the guard who survived the incident. As to that cross-examination, Klein testified at the evidentiary hearing as follows:
Q. Before going into that cross-examination, had you made some decision about how you were going to approach Mr. Turner?
A. I had many, many months to think about it, yes. I made a decision we were that I was not going to flat out attack him but be somewhat sensitive in cross-examining Mr. Turner because I thought he would be very sympathetic to the jury.
Q. And it was a tactical decision, I take it, that you're describing?
A. Yes, I suppose you could put it that way. It was tactical. Him being the surviving guard in the incident, I thought the jury would have tremendous sympathy for him and I think probably would look askance on anybody directly attacking this guy. He was lucky to be alive, after all.
Despite these practical considerations, Klein still conducted a thorough cross-examination. His performance in this area was not deficient.
Next, Van Poyck argues that Klein was deficient in failing to investigate a voluntary intoxication defense. The record refutes any suggestion that Van Poyck was intoxicated at the time of the offense. Indeed, Van Poyck himself told Klein that he was sober. Further, Klein independently investigated the possibility that there was cocaine in the car used. He found no evidence of such substance. Klein was not deficient for rejecting this theory of defense.
In sum, Van Poyck was not denied effective assistance of counsel at the guilt phase. We can find few, if any, deficiencies in Klein's performance. More important, however, is that fact that Van Poyck can demonstrate no prejudice. Van Poyck has the *698 heavy burden of demonstrating that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. Our review of the record demonstrates that the result in the guilt phase of this case is certainly reliable. This is reinforced by the testimony, at the evidentiary hearing below, of two of Van Poyck's own witnesses. We affirm the holding of the court below on this issue.

Brady Claim
As his fifth[4] issue, Van Poyck claims that a note in the state attorney's file was withheld from him during discovery. He further claims that the note was both material and exculpatory. In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." The note at issue is not evidence. Instead, it is work-product. Even if it were evidence, though, it would not be material. In United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383-84, 87 L.Ed.2d 481, (1985)(Blackmun, J., plurality opinion), id. at 685, 105 S.Ct. at 3385 (White, J., concurring in part and concurring in judgment), the United States Supreme Court forwarded the following formulation for determining materiality: "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Applying such a materiality standard to the facts of this case, there is clearly no reasonable probability that the result would have been altered had the challenged note been disclosed. The contents of the challenged note indicated that the "wound [came] from the driver's side." This presumptively militated against a finding that Van Poyck was the triggerman. It would certainly have no effect on Van Poyck's conviction for felony murder. Therefore, the court below properly rejected this claim. We affirm the denial of relief.

Remainder of Van Poyck's Claims
The remainder of Van Poyck's claims are as follows: (4) the great risk to many aggravating circumstance was unconstitutionally vague; (6) the judge and jury weighed the invalid aggravating factors that the murder was premeditated or that Van Poyck was the triggerman; (7) the prosecutorial argument as well as the jury instructions improperly shifted the burden of proof during the penalty phase proceedings; (8) the trial court improperly denied Van Poyck's challenges for cause during jury selection; (9) Van Poyck's constitutional rights were violated by the prosecutor's conduct during trial; (10) the acquittal and affidavit of O'Brien together with the testimony of Turner necessitate a new trial; (11) Enmund/Tison[5] errors necessitate a reversal of Van Poyck's death sentence; (12) the consideration, as an aggravating circumstance, of the underlying felony that had already been utilized to convict Van Poyck of felony murder was improper; (13) the trial court and prosecutor erred in indicating to the jury that sympathy was an inappropriate consideration; (14) the trial court failed to conduct an independent evaluation of the mitigation offered by Van Poyck; (15) the jury instructions given at the penalty phase were vague and confusing; and (16) the trial court committed fundamental error by failing to instruct the jury on justifiable or excusable homicide as part of the instruction on manslaughter.
All of these claims are procedurally barred. Most were raised and rejected on direct appeal.[6] One of these claims was not *699 objected to at trial and fails to rise to the level of fundamental error.[7] Finally, two of the claims are waived because they should have been raised on direct appeal.[8]
For the reasons expressed, we affirm the lower court's denial of all relief.
It is so ordered.
OVERTON, GRIMES, HARDING and WELLS, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which KOGAN, C.J. and SHAW, J., concur.
ANSTEAD, Judge, concurring in part and dissenting in part.
I dissent from that part of the opinion finding no error in the trial court's failure to consider the evidence of Dr. Villalobos, and in the majority's approval of the trial court's finding that trial counsel performed competently in investigating and preparing appellant's case for the penalty phase proceedings. This Court was faced with almost the identical circumstances in Deaton v. Dugger, 635 So.2d 4, 9 (Fla.1993), wherein we held that counsel who waited until after the guilt phase to prepare for the penalty phase and then "scrambled" to investigate and prepare mitigation "deprived [the defendant] of a reliable penalty phase proceeding." The same holding is mandated here.
The trial court ignored the issue of the failure to investigate and, instead, focused entirely on the apparently misrepresented statements of Dr. Villalobos, and the trial court's speculation that appellant's bad record would have resulted in a death recommendation regardless of any mitigation. Similarly, the majority here has ignored the undisputed evidence of lack of investigation and preparation, as well as this Court's own prior opinion which demonstrates counsel's utter failure to present any viable mitigating evidence to the trial judge and jury. See Van Poyck v. State, 564 So.2d 1066 (Fla. 1990). The majority fails to acknowledge, for example, that even the meager mitigation evidence presented by counsel was not put together until after the penalty phase began, and even then counsel conceded he had to "scramble" to put anything on.[9] Further, the attempt at mitigation by this "scramble" actually backfired when the trial court not only rejected it, but used it to bolster the case against the defendant. See 564 So.2d at 1069.
The majority has simply rehashed a lot of general information known to trial counsel in an attempt to put the best face on a very bad situation. Tellingly, the majority has devoted some ten pages to a vain attempt to support a flawed analysis of less than two pages issued by the trial court.[10]See Majority op. at 688-695.
The undisputed facts in this case present a blatant example of counsel's failure to investigate *700 and prepare a penalty phase defense. Once again, we have a lawyer appointed who had absolutely no experience in capital cases. Now, there are many resourceful and talented lawyers who, although lacking specific experience, would be able to learn the system and do an outstanding job of investigating and preparing a defense. However, in this case we have an inexperienced lawyer who has conceded that he was unprepared and, in his words "caught with [his] pants down," because he had erroneously assumed that the trial court would grant a lengthy continuance between the guilt phase and the penalty phase of the proceedings.
We do not have to guess at whether counsel did a proper investigation and prepared a defense before the penalty phase began: counsel admits he did not. Trial counsel acknowledged under oath that with the denial of a continuance he simply "ran out of time" to properly investigate mitigation. In addition, we have the sworn and unrebutted testimony of co-counsel who says the situation was so bad that he threatened to go to the trial judge and disclose the blatant lack of investigation and preparation. He concedes that he made a serious mistake in not doing so.
In the post-conviction hearing below the appellant presented a vast array of mitigating circumstances of the most serious nature that should have been thoroughly investigated and presented at the original penalty phase. Two brief excerpts from appellant's brief provide a flavor of the information that would have been discovered had a proper investigation of appellant's life been done:
Billy was sent to youth hall for the first time at age 12. Shortly after he arrived there, he was raped. Two years later, he was sent to the Florida School for Boys at Okeechobee. At Okeechobee, Billy was hog tied, drenched in water and left over night in the "wet room," and frequently sent to the "ice cream room," where he was given thirty licks with straps and paddles, the process being repeated if he cried out during the beating. T. 486, 498; App. 32. He also saw other children be sexually abused, and was placed under the supervision of older and larger offenders. T. 205-09. The substandard conditions at Okeechobee are well documented, see generally App. 37, and were described in detail by juvenile justice expert Paul DeMuro. DeMuro described the dangerous, overcrowded conditions in the dormitories, where status offenders were not separated from violent offenders, nor smaller children from larger, leading to frequent physical and sexual assaults on the younger and smaller children; the absence of any attempt to treat or rehabilitate youthful offenders; and the fact that small, middle class white boys without a history of institutionalization (like Billy Van Poyck when he was first sent to Okeechobee) were at the greatest risk. T. 319-32.
....
Approximately two years after Billy was sent to adult prison, he suffered a breakdown. For most of the next several years *701 he received psychiatric treatment and medication, including "industrial strength" dosages of antipsychotic medications, and two admissions to the Florida State Hospital in Chattahoochee. T. 595-605; see generally Def. Exs. 23, 24. Dr. Rothenberg believes that this breakdown was the predictable result of the failure to provide the type of long term inpatient treatment he had recommended for Billy:
This subsequent history confirms my initial diagnosis. It is predictable and almost inevitable that a young and vulnerable person, already suffering from psychosis, would deteriorate further when placed in an adult prison, without any therapeutic intervention. In the absence of the type of therapeutic intervention that I recommended, there is no reason to believe that Mr. Van Poyck's mental illness has ever dissipated. While the observability of such a mental illness fluctuates over time and may be masked by medication, the mental illness itself persists.
App. 46.
All of this mitigating evidence was readily available to trial counsel, but none of it was discovered or presented. The reasons for these failures are not far to seek. Mr. Van Poyck's lead attorney was Cary Klein. Klein was a general litigation attorney who had never before handled a capital case. T. 1041-42. From the beginning of this difficult, complex case Klein believed a felony murder conviction likely, and that the case would almost certainly go to a penalty phase proceeding. T. 1145. Also, at the very outset of the case Klein discussed potential mitigation with Mr. Van Poyck. T. 1060-61. However, Klein did not investigate for mitigation at any time prior to the trial. Instead, he had decided to wait until the guilt phase of the trial was over to begin penalty investigation because he believed that the trial court would give a one to three week continuance between phases. T. 1158. He explained at the hearing that he was counting on this time to "investigate" penalty phase issues and felt safe in doing so because the court had "assured" him that there would be a few weeks between phases. Id. As it turned out, no continuance was forthcoming, and the record contains no written or oral order or promise of a continuance. See T. 1196.
Appellant's Initial Brief at 15, 17-18.
In our previous review of this case we found insufficient evidence of premeditation but affirmed appellant's guilt on a felonymurder theory. In our opinion we upheld the sentence of death and expressly noted that the trial court properly rejected the meager mitigation offered by counsel. Van Poyck v. State, 564 So.2d 1066 (Fla.1990). Knowing what we do now, we should not give our approval to a sentence of death predicated upon a patent case of ineffective assistance of counsel. In doing so we are simply providing additional support to the already considerable body of evidence that the death penalty process is seriously flawed by the legal system's tolerance of incompetent counsel. Cf. Stephen B. Bright, Counsel for the Poor: The Death Sentence Not for the Worst Crime but for the Worst Lawyer, 103 Yale L.J. 1835 (1994). Van Poyck is not going anywhere; he has been convicted and imprisoned for first degree murder. His conviction and imprisonment are not in question. We should apply our holding in Deaton v. Dugger and remand this case for a reliable penalty phase proceeding in which evidence of aggravation and mitigation can be presented by counsel prepared on both sides.
KOGAN, C.J. and SHAW, J., concur.
NOTES
[1] It must be noted that Van Poyck blurs the line between his life history and his mental-health history in this portion of his brief. To the extent that he reargues that Klein was deficient for failing to adequately investigate and present Van Poyck's mental-health history, we ignore such argument as it has been resolved above.
[2] We note that Van Poyck raised this same claim in his direct appeal. At that time we disposed of the issue by stating that "[a]fter fully considering these issues in light of the record in this cause, we find no error which requires a new sentencing proceeding." Van Poyck v. State, 564 So.2d 1066, 1070 (Fla. 1990). The State, however, argued in its direct-appeal brief that "[a]ppellee contends that the issue is improperly before this Court on direct appeal." As is proper, the State does not argue that the claim is procedurally barred in this collateral action. We choose to address this claim on its merits. For the reasons explained, though, we find that it has no merit.
[3] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[4] Van Poyck's fourth issue concerning the great risk to many aggravating circumstance is procedurally barred and will, consequently, be addressed with other procedurally barred issues after we finish rejecting the claims that merit substantive review.
[5] Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).
[6] Claims that were raised and resolved on direct appeal include (4), (6), (8), (10)(this material does not qualify as newly discovered evidence and the challenges to the convictions for attempted escape and premeditated murder were resolved in the direct appeal), (11), (12), (14), and (15). As to claim (4), we specifically stated in the direct appeal that "[w]e find that none of the other claims merit discussion. Further, we conclude that each of the aggravating circumstances found by the trial judge was properly established in this record and that the trial judge could properly conclude that the aggravating circumstances outweighed the mitigating evidence in this cause." Van Poyck, 564 So.2d at 1071. No subsequent change in the law is relevant to this analysis and therefore the procedural bar remains in place.
[7] Claim (9) is barred due to a lack of a contemporaneous objection at trial. Any error would not be fundamental.
[8] Claims (7) and (13) should have been raised on direct appeal.
[9] This "scramble" included the ill-fated attempt to use Dr. Villalobos, who, without time to do and review testing and secure background materials on the defendant, refused to get involved.
[10] The entire analysis and findings of the trial court are set out in less than two (2) pages that state:

The great bulk of all the testimony received by the Court centers around counsel's alleged ineffective assistance during the penalty phase. Both trial co-counsel, Dubiner and Petitioner's expert, Haughwout, testified in great depth on this issue.
Petitioner also presented the live expert testimony of Jan Vogelsang, a licensed clinical social worker, and Dr. Robert Phillips, a psychiatrist, along with the affidavits of two additional experts. Eight of the remaining nine live witnesses and most of the affiants were lay people, all of who [sic] testified to different aspects about the Petitioner's dysfunctional background. Each stated they could and would have testified during the penalty phase of the trial if called upon to do so.
The nexus of Petitioner's argument under this claim is primarily based upon the allegation that counsel failed to conduct a penalty phase investigation until the conclusion of the guilt-innocence phase; that what investigation was done was totally inadequate and ineffective and failed to present any in-depth mitigating mental health and background evidence.
The sole witness presented by the State was Petitioner's trial co-counsel, Cary Klein. Despite Petitioner's evidence to the contrary, Klein investigated the possibility of mitigating mental health factors. In fact, he obtained the services of one Dr. Villalobos, a psychiatrist, who after interviewing the Petitioner prior to the penalty phase and reviewing psychological tests performed upon the Petitioner, told Klein that he, Dr. Villalobos, had nothing helpful to say about the Petitioner. Dr. Villalobos also told Klein that the Petitioner had told him that he, the Petitioner, had faked mental illness while in prison. Dr. Villalobos further informed Klein that the test results were unfavorable to Petitioner, that petitioner was a sociopath, and that he saw no evidence of organic brain syndrome. Armed with this information together with Petitioner's attempted escapes and long history of incarceration, Klein made a conscious, tactical judgment not to pursue this line of defense in the penalty phase of the trial for fear of opening a Pandora's box.
In view of the overwhelming evidence of guilt coupled with the Petitioner's extensive criminal and juvenile background, his admissions at the time of the trial, and in light of the 11 to 1 vote to impose the death penalty (which means a minimum of 5 jurors would have had to have voted differently), Petitioner has failed to carry the burden established by the United States Supreme Court in Strickland, i.e. the probability of a different trial outcome.