PER CURIAM.
William Van Poyck, a prisoner under sentence of death and under an active death warrant, appeals from an order dismissing his third successive motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.851 and summarily denying his motion to vacate his sentence of death or, in the alternative, motion for an evidentiary hearing. Van Poyck also petitions this Court for a writ of habeas corpus. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm the circuit court’s order and deny habeas relief. Van Poyck’s pending requests for a stay of execution are also denied.
BACKGROUND
Van Poyck was convicted of first-degree murder for his role in the June 1987 killing of correctional officer Fred Griffis in Palm Beach County. The following facts are derived from Van Poyck’s direct appeal:
[O]n June 24, 1987, correctional officers Steven Turner and Fred Griffis transported James O’Brien, a state prison inmate, in a van from Glades Correctional Institute to a dermatologist’s office for an examination. Griffis, who was not armed, drove the van while Turner watched O’Brien, who was secured in a caged area behind Griffis. After Griffis pulled the van into an alley behind the doctor’s office, Turner looked down for his paperwork. Upon looking up, he saw a person, whom he later identified as Van Poyck, aiming a pistol at his head. Van Poyck ordered Turner to exit the van. At the same time, Frank Valdefs],[1] an accomplice of Van Poyck’s, went to the driver’s side of the van. Turner testified that Van Poyck took his gun, ordered him to get under the van, and kicked him while he was attempting to comply with Van Poyck’s order. He testified that, while under the van, he saw Griffis exit the van; he noticed another person forcing Griffis to the back of the van; and, while noticing two sets of feet in close proximity to the rear of the van, he heard a series of shots and saw Griffis fall to the ground. Turner further stated that Van Poyck had stopped kicking him when the gunfire started, but noted that he did not know where Van Poyck was at the time of the shooting. Griffis was shot three times, once in the head and twice in the chest. Expert testimony indicated that the shot to the head was fired with the barrel of the gun placed against Griffis’ head and that each of the wounds would have been fatal. It was also determined that the murder weapon was a Hungarian Interarms nine millimeter semiautomatic pistol.
After Griffis was shot, Turner was forced to get up from under the van and look for the keys. Upon realizing that Turner did not have them, Valde[s] fired numerous shots at a padlock on the van in an attempt to free O’Brien. One of the shots ricocheted off of the van and struck Turner, causing him minor injuries. Turner testified that at around *350 this time Van Poyck aimed the Hungarian Interarms semiautomatic nine millimeter pistol at him and pulled the trigger. Although no bullet was fired, Turner stated that he heard the gun click. Turner then fled the scene when Van Poyck turned his attention to Valde[s], who was smashing one of the windows on the van. After Van Poyck noticed that two cars had just driven into the alley, he and Valde[s] approached the cars and Van Poyck shattered the windshield of one of the cars with the butt of a gun. Van Poyck and Valdefs] then ran to a Cadillac parked in an adjacent parking lot and departed from the scene. A police officer, who arrived at the scene and witnessed the two men leaving, radioed for help and a chase followed. During the chase, Van Poyck leaned out of the car window and fired numerous shots at the police cars in pursuit, hitting three of them.
Valde[s] eventually lost control of the Cadillac and the car crashed into a tree. Van Poyck and Valde[s] were immediately taken into custody and four pistols were recovered from the car: a Hungarian Interarms nine millimeter semiautomatic pistol, a Sig Sauer nine millimeter semiautomatic pistol, a Starr .22 caliber semiautomatic pistol, and Turner’s Smith and Wesson .38 caliber service revolver.
Van Poyck, testifying [on] his own behalf, denied that he shot Griffis and stated that, while kicking Turner, he heard the gunshots and saw Griffis fall to the ground. He did, however, acknowledge that he planned the operation and recruited Valde[s] to assist him in his plan. Additionally, he stated that they took three guns with them.
Van Poyck v. State (Van Poyck I), 564 So.2d 1066, 1067-68 (Fla.1990), cert. denied, 499 U.S. 932, 111 S.Ct. 1339, 113 L.Ed.2d 270 (1991).[2] The jury convicted Van Poyck of first-degree murder under both premeditated and felony-murder theories.[3] At the conclusion of the penalty phase, the jury recommended a death sentence by a vote of 11 to 1. Id. at 1068. The trial court followed the jury’s recommendation, finding four aggravating circumstances and nothing in mitigation. State v. Van Poyck, Case Nos. 87-6736-CF A02, 88-11116CF A02 (Fla. 15th Cir.Ct. Dec. 21, 1988) (Sentencing Order).[4] Specifically, the trial court found the following ag-gravators:
*351 (1) that the crime was committed while Van Poyck was under a sentence of imprisonment in that he was on parole when he committed the act; (2) that the crime was committed for the purpose of effecting an escape from custody; (3) that Van Poyck knowingly created a great risk of death to many persons; and (4) that Van Poyck was previously convicted of another felony involving the use or threat of violence to some person.[5]
Van Poyck I, 564 So.2d at 1068.
On direct appeal, Van Poyck raised six guilt phase issues[6] and fifteen penalty phase issues.[7] We found that the evidence was insufficient to establish first-degree premeditated murder, but “clearly sufficient” to convict him of first-degree felony murder. Id at 1069. We observed that the “[Sjtate’s evidence was conflicting as to where Van Poyck was at the time of the killing.” Id In our discussion of Van Poyck’s penalty phase claims, we found no merit in Van Poyck’s assertions “that he was a minor actor and did not have the culpable mental state to kill.” Id. at 1070. We went on to say:
Although the record does not establish that Van Poyck was the triggerman, it *352 does establish that he was the instigator and the primary participant in this crime. He and Valde[s] arrived at the scene “armed to the teeth.” Since there is no question that Van Poyck played the major role in this felony murder and that he knew lethal force could be used, we find that the death sentence is proportional.
Id. at 1070-71.
Accordingly, we affirmed Van Poyck’s first-degree murder conviction and sentence of death. Id.
In December 1992, Van Poyck raised sixteen claims for relief in his initial motion for postconviction relief pursuant to Florida Rule of Criminal Procedure S.850.[8] A “substantial” evidentiary hearing was held after which the postconviction court denied all relief; on appeal, we affirmed the denial of relief. Van Poyck v. State (Van Povck II), 694 So.2d 686, 688 (Fla.1997), cert. denied, 522 U.S. 995, 118 S.Ct. 559, 139 L.Ed.2d 400 (1997). In February 1997, Van Poyck filed his first petition for writ of habeas corpus in this Court, wherein he claimed (1) ineffective assistance of appellate counsel; (2) that his death sentence was unconstitutional because the judge and jury weighed invalid aggrava-tors; and (3) that he was convicted of nonexistent crimes. We denied habeas relief. Van Poyck v. Singletary, 715 So.2d 930 (Fla.1998), cert. denied, 526 U.S. 1018, 119 S.Ct. 1252, 143 L.Ed.2d 349 (1999). Van Poyck filed his second state habeas petition in this Court in October 1998, wherein he argued that he was entitled to a belated direct appeal; we again denied relief. See Van Poyck v. Singletary, 728 So.2d 206 (Fla.1998) (table).
Van Poyck then began proceedings in federal court where he filed, in February 1999, a petition for writ of habeas corpus in the United States District Court for the Southern District of Florida. Federal ha-beas relief was denied. Van Poyck v. Fla. Dep’t of Corr. (Van Poyck III), 290 F.3d 1318 (11th Cir.2002), cert. denied, Van Poyck v. Moore, 537 U.S. 812, 123 S.Ct. 70, 154 L.Ed.2d 13 (2002). The federal district court granted a certificate of appeala-bility as to six claims.[9] The Eleventh Cir *353 cuit Court of Appeals affirmed the district court’s denial of relief. Id.
In December 2002, Van Poyck filed his third habeas petition in this Court setting forth two claims;[10] this Court denied relief. See Van Poyck v. Crosby, 860 So.2d 980 (Fla.2008) (table), cert. denied, 541 U.S. 974, 124 S.Ct. 1884, 158 L.Ed.2d 469 (2004). In September 2003, Van Poyck filed a postconviction motion for DNA testing of the clothing worn by him and Valdes at the time of the murder, pursuant to Florida Rule of Criminal Procedure 3.853. In this motion, Van Poyck alleged that such testing could establish that Valdes was the triggerman. Van Poyck’s motion was summarily denied by the postconviction court, and we affirmed the trial court’s decision. Van Povck v. State (Van Poyck IV), 908 So.2d 326, 330 (Fla.2005), cert. denied, 547 U.S. 1035, 126 S.Ct. 1570, 164 L.Ed.2d 326 (2006).
In April 2005, Van Poyck filed his first successive motion for postconviction relief, asserting a claim of newly discovered evidence based on an affidavit by Enrique Diaz, a prison acquaintance of Valdes. Diaz stated in his affidavit that “between 1990 and 1997, Valdes ‘repeatedly and consistently’ said he had shot and killed [Officer] Griffis.” The postconvietion court summarily denied Van Poyck’s motion, and we affirmed the denial of relief. Van Poyck v. State (Van Poyck V), 961 So.2d 220, 223, 227-28 (Fla.2007), cert. denied, 552 U.S. 1098, 128 S.Ct. 897, 169 L.Ed.2d 728 (2008); see also Van Poyck v. McDonough, 954 So.2d 28 (Fla.2007) (denying Van Poyck’s fourth state habeas petition) (table); Van Poyck v. McCollum (Van Poyck VI), 646 F.3d 865 (11th Cir.2011) (affirming the dismissal of Van Poyck’s 42 U.S.C. § 1983 action seeking access to evidence to conduct DNA testing for executive clemency). In December 2010, Van Poyck filed his second successive postconviction motion, asserting a claim of newly discovered evidence based on four jurors’ affidavits. The postconviction court summarily denied Van Poyck’s motion, and we affirmed the denial. Van Poyck v. State (Van Poyck VII), 91 So.3d 125, 126 (Fla.2012).
On May 3, 2013, the Governor signed Van Poyck’s death warrant.[11] On May 24, 2013, Van Poyck filed in the circuit court the instant third successive motion for postconviction relief as well as the instant motion to vacate his sentence of death or, in the alternative, motion for an evidentia-ry hearing. On May 29, 2013, the posteon-viction court dismissed Van Poyck’s third successive motion for postconviction relief and summarily denied his motion to vacate his sentence of death or, in the alternative, motion for an evidentiary hearing. Van Poyck now appeals that postconviction court order and also petitions for a Writ of Habeas Corpus, which is his fifth state habeas petition.
ANALYSIS
Claim of Newly Discovered Evidence
Florida Rule of Criminal Procedure 3.851 governs the timeliness of, and necessity of an evidentiary hearing on, succes *354 sive postconviction motions in capital cases. Rule 3.851(d)(1) bars a postconviction motion filed more than one year after a judgment and sentence are final. An exception to this rule permits otherwise untimely motions if the movant alleges that “the facts on which the claim is predicated were unknown to the movant or the movant’s attorney and could not have been ascertained by the exercise of due diligence.” Fla. R.Crim. P. 3.851(d)(2)(A). Rule 3.851(f)(5)(B) permits denial of a successive postconviction motion without an evidentiary hearing “[i]f the motion, files, and records in the case conclusively show that the movant is entitled to no relief.” The summary denial of a newly discovered evidence claim will be upheld if the motion is legally insufficient or its allegations are conclusively refuted by the record. McLin v. State, 827 So.2d 948, 954 (Fla.2002).
To obtain a new capital penalty phase proceeding based on newly discovered evidence, in addition to demonstrating that the evidence could not have been discovered previously through the exercise of due diligence, the defendant must establish that the newly discovered evidence probably would have produced a life sentence. Ventura v. State, 794 So.2d 553, 570-71 (Fla.2001): see also Jones v. State, 591 So.2d 911, 915 (Fla.1991) (“[T]he newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.”); Scott v. Dugger, 604 So.2d 465, 468 (Fla.1992) (“The Jones standard is also applicable where the issue is whether a life or death sentence should have been imposed.”).
Van Poyck’s present claim of newly discovered evidence is based on a May 16, 2013, affidavit of Wanda Valdes, who is the widow of Van Poyck’s co-defendant, Frank Valdes.[12] In her affidavit, Mrs. Valdes states that when she was married to Frank, he told her that he “shot Officer Griffis in the head, and a couple more times,” that Van Poyck “was not the leader of [him],” and “[d]on’t think for a minute [Van Poyck] ... led anything.” Mrs. Valdes also says in her affidavit that Frank told her that Van Poyck said to him prior to the escape attempt: “I don’t want to shoot anybody. I don’t want you shooting anybody. I don’t want to go cowboy on this. Nobody’s gonna get hurt in this. I just want to take the keys and get [James] O’Brien out.” Mrs. Valdes claims that she was “scared to death [that] if [she] told what [she] knew, something would happen to [her] or [her] children because Frank still has friends on the outside.” Mrs. Valdes also believes that Van Poyck would have received a new trial or a life sentence.[13]
*355 The postconviction court summarily denied Van Poyck’s claim of newly discovered evidence, finding that it was “nothing more than a variation of the position Van Poyck has taken all along in this case, namely that he was not the person who actually pulled the trigger and killed Officer Griffis.” Because of the “well documented facts of this case, the evidence would not be of such a nature that it would have probably yielded a less severe sentence,” the postconviction court ruled.[14] We agree, even if the information in the affidavit is considered, it does not negate the fact that Van Poyck instigated the escape attempt, and fired numerous shots in their attempt to flee the scene.
Van Poyck contends that Mrs. Valdes’ affidavit establishes that Van Poyck was not a “major participant” in the crime and that he did not act with reckless indifference to human life, thus the affidavit probably would produce a life sentence at a new sentencing phase. We assume ar-guendo that (1) Van Poyck has satisfied Florida Rule of Criminal Procedure 3.851(d)(2)(A), and (2) there are no eviden-tiary bars to the admissibility of this evidence. Therefore, we decide whether Van Poyck has demonstrated that Mrs. Valdes’ affidavit is of such a nature that it would probably yield a less severe sentence.
At the outset, we reject Van Poyck’s argument that the jury and sentencing judge were under a mistaken belief that Van Poyck was the triggerman. In Van Poyck’s direct appeal, we determined that while the evidence at trial was insufficient to establish first-degree premeditated murder, the evidence was *356 “clearly” sufficient to convict Van Poyck of first-degree felony murder. Van Poyck I, 564 So.2d at 1069. We explained that the State’s evidence was conflicting as to Van Poyck’s physical position at the time of the murder. Id. In finding Van Poyck’s death sentence proportional, we stated:
Although the record does not establish that Van Poyck was the triggerman, it does establish that he was the instigator and the primary participant in this crime. He and Valde[s] arrived at the scene “armed to the teeth.” Since there is no question that Van Poyck played the major role in this felony murder and that he knew lethal force could be used, we find that the death sentence is proportional.
Id. at 1070-71. Van Poyck’s claim that “the judge and jury weighed the invalid aggravating factors that the murder was premeditated or that Van Poyck was the triggerman” was raised and resolved on direct appeal, and again raised in his initial postconviction proceeding and a habeas petition. Van Poyck II, 694 So.2d at 698 n. 6 (finding claim procedurally barred in initial postconviction proceeding); Van Poyck, 715 So.2d at 931 (concluding that Van Poyck’s claim that “his death sentence is unconstitutional because the judge and jury weighed the invalid aggravators that the murder was premeditated or that Van Poyck was the shooter” was procedurally barred in his habeas petition).
“[T]his Court has never found that Van Poyck was not the triggerman; we have only recognized that the evidence introduced at his trial was insufficient to establish that he was.” Van Poyck VII, 91 So.3d at 129. “[I]n every state postconviction motion filed since his sentence became final, Van Poyck ... has raised a variant of a claim regarding his non-triggerman status.” Id. at 128. For example, Van Poyck moved for postconviction DNA testing of the clothing worn by him and Valdes at the time of the murder, alleging that it could establish that Valdes, and not Van Poyck, was the triggerman. Van Poyck IV, 908 So.2d at 328. We found that there was “no reasonable probability that Van Poyck would have received a lesser sentence had DNA evidence establishing that he was not the triggerman been presented at trial”:
During the penalty phase, the State argued in closing that the evidence supported a finding that Van Poyck was the triggerman, but even if the jurors were to find otherwise, they could still recommend the death penalty if they concluded that Van Poyck played a major role in the felony murder and that he acted with reckless indifference to human life. Therefore, the State’s theory that the death penalty was appropriate was not based primarily on Van Poyck’s trigger-man status. Similarly, the trial court did not rely on Van Poyck’s triggerman status in imposing the death penalty. The trial court found that the death penalty was an appropriate sentence because the mitigating evidence presented was insufficient to outweigh the aggravating circumstances. None of the aggravating circumstances found by the trial court were based on Van Poyck’s triggerman status.
[[Image here]]
Evidence establishing that Van Poyck was not the triggerman would not change the fact that he played a major role in the felony murder and that he acted with reckless indifference to human life.
Id. at 329-30 (citation and footnotes omitted).[15]
*357 In a prior claim of newly discovered evidence, Van Poyck presented an affidavit by a prison acquaintance of Valdes, who maintained that “between 1990 and 1997, Valdes ‘repeatedly and consistently’ said he had shot and killed [Officer] Griffis.” Van Poyck V, 961 So.2d at 223. Finding Van Poyck IV controlling, we concluded that “different evidence on the same fact would not ‘probably’ create a different result.” Id. at 225. “At most, non-trigger-man status would have constituted non- *358 statutory mitigation which, considering the four aggravating factors and absence of other mitigation, would probably not have yielded a lesser sentence.” Id. at 226. We conclude that Valdes’ confession to being the triggerman by way of Mrs. Valdes’ affidavit — which is “different evidence on the same fact,” id. at 225 — would not “probably” create a different result.
The remaining portion of Mrs. Valdes’ affidavit, including that Valdes said to his wife that Van Poyck did not lead him and that Van Poyck stated beforehand to Valdes that no one would get hurt, would also not “probably” create a different result. At trial, Officer Turner testified that after Officer Griffis was shot, “Van Poyck aimed the Hungarian Interarms semiautomatic nine millimeter pistol at [Officer Turner’s head, said ‘y°u are a dead man,’] and pulled the trigger. Although no bullet was fired, Turner stated that he heard the gun click.”[16] See id. at 1068. During the ensuing police chase, “Van Poyck leaned out of the car window and fired numerous shots at the police cars in pursuit, hitting three of them.” Id. Van Poyck testified at trial that he recruited Valdes to assist him with his plan:
DEFENSE COUNSEL: So, when you got the phone call the morning of June 24th, 1987 advising you where he [James O’Brien] was going to be, what did you do?
VAN POYCK: I went to Frank’s place, which is [in] Pompano, and I asked him if he would help me get O’Brien out.
DEFENSE COUNSEL: What did Frank say?
VAN POYCK: He agreed.
On cross-examination, Van Poyck admitted that he planned the operation and knew that he and Valdes were bringing loaded guns:
PROSECUTOR: Wasn’t Mr. Valde[s]’ idea to set up this prison break, was it?
VAN POYCK: No, sir, it was not.
PROSECUTOR: It was all your idea from the very beginning?
VAN POYCK: Yes, sir.
PROSECUTOR: Wasn’t Mr. Valde[s] giving directions of what to do, was it?
VAN POYCK: That would probably be correct, yes.
PROSECUTOR: It was you who was giving directions to Mr. Valde[s] as to how things were going to take place?
VAN POYCK: Yes, sir.
PROSECUTOR: You were the one that put this all together, you were the mover and shaker behind this whole thing; correct?
VAN POYCK: That would be correct.
[[Image here]]
PROSECUTOR: Now, before you went to West Palm Beach that day, you knew that all three guns were loaded?
VAN POYCK: Yes, sir.
PROSECUTOR: You checked them to make sure, didn’t you?
VAN POYCK: I, I knew they were loaded. I knew they were loaded.
Van Poyck’s actions during the escape attempt and the resulting police pursuit were clearly inconsistent with a prior intent that no one would get hurt. The contents of Mrs. Valdes’ affidavit do not persuade us to recede from our prior findings that Van Poyck was the “instigator,” *359 “the primary participant,” had “the major role in this felony murder,” Van Poyck I, 564 So.2d at 1070-71, and “acted with reckless indifference to human life,” Van Poyck IV, 908 So.2d at 330.[17]
We reject the contention advanced by Van Poyck that the Enmund/Tison standard no longer justifies the execution of those individuals who do not kill. We previously summarized the Supreme Court’s holding in Enmund:
[I]n Enmund the Court indicated that in the felony murder context a sentence of death was not permissible if the defendant only aids and abets a felony during the course of which a murder is committed by another and defendant himself did not kill, attempt to kill, or intend that a killing take place or that lethal force be used.
Stephens v. State, 787 So.2d 747, 759 (Fla.2001). In Tison, the Supreme Court held “that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement.” 481 U.S. at 158, 107 S.Ct. 1676 (footnote omitted). Because Van Poyck played a “major role” in this felony-murder and acted with “reckless indifference to human life,” Van Poyck’s sentence of death meets the Enmund/Tison standard.
Accordingly, we deny Van Poyck’s claim of newly discovered evidence which is predicated on the affidavit of Wanda Valdes. Therefore, we affirm the postcon-viction court’s summary denial of this claim.
Claim Relating to Counsel on Direct Appeal
In the instant habeas petition, Van Poyck argues that his counsel on direct appeal, William Lasley, was incompetent, non-existent, and ineffective per se.[18] Van Poyck previously raised Lasley’s alleged ineffectiveness in his initial habeas petition:
Van Poyck claims the trial judge wrongfully forced him to exhaust his peremptory challenges on seven venirepersons who should have been dismissed for cause, then erroneously denied his request for an additional peremptory challenge. Van Poyck asserts that as a result of the trial judge’s error, two challenged jurors served on the jury. Van Poyck contends that his appellate counsel on direct appeal [Lasley ] compounded the error by failing to properly present the issue because he identified the wrong jurors seated on the jury, and then failed to argue the issue in any depth or cite relevant legal authority. Van Poyck states that this Court appropriately rejected the argument because the jurors identified by his appellate counsel, although unsuccessfully challenged for cause, were subsequently dismissed for personal reasons, and thus it was unnecessary for Van Poyck to exercise peremptory challenges. Van Poyck claims that his appellate counsel’s deficient performance was prejudicial because this Court would have granted a new trial had the issue been properly presented.
*360 Van Poyck v. Singletary, 715 So.2d 930, 931 (Fla.1998) (emphasis added and footnotes omitted). On August 29, 1997, Van Poyck filed in this Court a motion to amend his habeas petition “based upon appellate counsel’s mental infirmities and severe drug addiction,” a motion for evi-dentiary hearing, and accompanying memorandum of law. On September 10, 1997, we ordered as follows:
Petitioner’s Motion to Amend Habeas Corpus Petition Based Upon Appellate Counsel’s Mental Infirmities and Severe Drug Addiction and Motion for Eviden-tiary Hearing filed in the above cause is denied as to consideration at oral argument; however, said motion will be considered by the Court on its merits subsequent to oral argument.
Order at 1, Van Poyck v. Singletary, Case No. 89, 870 (Fla. Sept. 10, 1997) (emphasis added). The following day we held oral argument.
In' rendering our decision on Van Poyck’s habeas petition, we “[did] not agree that the trial court wrongfully forced Van Poyck to exhaust his peremptory challenges or that Van Poyck’s appellate counsel rendered ineffective assistance:”
Based on our examination of the record, we find that the trial judge was clearly within his discretionary authority in denying the challenges for cause [as] to the seven venirepersons now claimed by Van Poyck to have been biased or prejudiced. During individual voir dire, each of the seven persons repeatedly and unequivocally stated that he or she could render a verdict based solely on the evidence and the instructions given by the trial judge. We find nothing in this record that mandates that any of these venirepersons should have been excused for cause.
[[Image here]]
In conclusion, we find that Van Poyck’s appellate counsel did not render ineffective assistance for failing to pursue and argue Van Poyck’s claim that the other seven venirepersons were biased or prejudiced.
Van Poyck v. Singletary, 715 So.2d at 931-34 (footnote omitted).
Van Poyck then moved for rehearing and/or clarification of our decision, raising again the allegations that Lasley was mentally ill, drug-addicted, and hospitalized and that we failed to address the issue raised in his motion to amend the habeas petition. We denied Van Poyck’s motion for rehearing and/or clarification. Van Poyck subsequently filed a second habeas petition, wherein he claimed that he was entitled to a belated direct appeal because he was represented by a mentally ill, drug-addicted appellate counsel, who was ineffective per se. We denied Van Poyck’s second habeas petition. Van Poyck v. Singletary, 728 So.2d 206 (Fla.1998) (table).
Van Poyck asserts that we did not consider this claim — that Lasley was ineffective per se due to his drug addiction and complete failure to handle Van Poyck’s appeal — on the merits despite our previous commitment. As noted above, on September 10, 1997, this Court said that after oral argument, it would consider on the merits Van Poyck’s claim involving the alleged mental infirmities and drug addiction on the part of Lasley; we did. A Court’s decision not to address a specific claim in a written opinion does not mean that the Court did not consider the claim.[19] Be *361 cause we have previously fully considered and rejected Van Poyck’s claim that Las-ley suffered from mental infirmities and drug addiction during his representation of Van Poyck, this claim is procedurally barred. See Johnson v. Singletary, 647 So.2d 106, 109 (Fla.1994) (“Successive ha-beas corpus petitions seeking the same relief are not permitted.... ”).
Assuming that this claim is not procedurally barred, we find the documentation which Van Poyck submitted to the Court fails to show that Lasley, in his representation of Van Poyck — i.e., from the time Lasley was appointed to represent Van Poyck on direct appeal, March 27, 1989, to the time we granted Van Poyck’s motion for leave to substitute counsel on March 5, 1990 — contemporaneously suffered from any mental infirmities or drug addiction.[20]
After being appointed on March 27, 1989, Lasley filed a 101-page initial brief on behalf of Van Poyck on August 31, 1989. In this brief, Lasley set forth twenty-one issues, which were the type of claims ordinarily raised on direct appeal.[21] In fact, it was Lasley who successfully argued in the brief that the evidence was insufficient to establish first-degree premeditated murder. Van Poyck I, 564 So.2d at 1069. We find what Van Poyck stated in his motion for an extension of time to file a petition for writ of certiorari to the United States Supreme Court significant. In this November 2, 1990, motion, filed by Lasley and Peter Gable, on behalf of Van Poyck, it is stated that Las-ley “has been unable to perform any duties associated with the practice of law due to personal illness that began in mid-October and left the balance of the practice responsibilities on Peter Grable.” (Emphasis added.) The personal illness issues which began in October 1990, were therefore after Lasley filed Van Poyck’s initial brief and after we granted Van Poyck’s motion for leave to substitute counsel.
We also note that during the hearing below, counsel for Van Poyck maintained that Van Poyck lacked counsel for six years after he was no longer represented by Lasley. The record refutes this assertion. Van Poyck was represented by several lawyers from the time we issued our direct appeal opinion to the filing of his first habeas petition in this Court. On November 6, 1990, shortly after we issued our mandate in Van Poyck’s direct appeal, the circuit judge appointed Michael Dubiner as counsel for Van Poyck. On December 8,1992, Jeffrey Davis, on behalf of Van Poyck, filed a motion to vacate his convictions and death sentence, which totaled 270 pages. “A substantial evidentiary hearing was held on multiple issues after which the lower court denied all relief.” Van Poyck II, 694 So.2d at 688. On September 7, 1994, Jeffrey Davis, along with Matthew Lawry, appealed that decision to this Court. On May 1, 1995, Jeffrey Davis, Matthew Lawry,[22] and Mitchell Moser filed a corrected initial brief on behalf of Van Poyck. On June 9, 1995, this Court granted Jeffrey Davis, Mitchell Moser, and Ronni Flannery’s motion for admission pro hac vice. On March 27, 1997, we affirmed the postconviction *362 court’s denial of relief. On April 11, 1997, Jeffrey Davis, Mitchell Moser, and Gerald Bettman filed a motion for rehearing and for oral argument, on behalf of Van Poyck, which we denied.
In sum, we find that Van Poyck’s claim regarding his counsel on direct appeal is procedurally barred and without merit.
Ineffective Assistance of Trial Counsel Claim
Van Poyck takes issue with our decision in Van Poyck II, where in 1997, we affirmed the denial of his initial motion for postconviction relief. 694 So.2d at 688. Van Poyck claims that we wrongly held that.a lawyer may make a strategic decision about what to present at sentencing in a capital case before conducting a thorough investigation and that we reduced to irrelevance and/or ignored the testimonies of postconviction defense experts.
In the initial postconviction proceeding, Van Poyck claimed that his trial counsel provided ineffective assistance during the penalty phase due to counsel’s “fail[ure] to adequately investigate mitigating evidence of [his] problematic life and mental-health histories.” Id. at 689. We found no merit in Van Poyck’s claim. Id. at 694. We determined that Van Poyck failed to demonstrate the deficiency prong under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
As to his claim regarding deficient investigation and presentation of mental-health evidence, we find that [trial counsel] had clear tactical reasons for avoiding such a line of argument.
[[Image here]]
As to [trial counsel’s] choices regarding the presentation of Van Poyck’s life history during the penalty-phase proceeding, we likewise find no error. Evidence of Van Poyck’s life history was adequately presented by [trial counsel] at the penalty-phase proceeding.
Van Poyck II, 694 So.2d at 689, 692 (footnote omitted); see also Van Poyck III, 290 F.3d at 1323-24 (finding our conclusion that trial counsel was not deficient in failing to introduce mental health history was not unreasonable, and accepting, as reasonable, our conclusion that the evidence of Van Poyck’s life history was adequately presented by trial counsel, as well as the findings that support it).
Because we have previously considered and rejected Van Poyck’s claim of ineffective assistance of trial counsel during the penalty phase, this claim is procedurally barred. We decline Van Poyck’s invitation to reconsider and alter our prior rulings.
CONCLUSION
Based on the foregoing, we affirm the circuit court’s order dismissing Van Poyck’s third successive motion for post-conviction relief and summarily denying his motion to vacate his sentence of death or, in the alternative, motion for an eviden-tiary hearing. We also deny habeas relief. Van Poyck’s pending requests for a stay of execution are also denied. No rehearing will be entertained by this Court and the mandate shall issue immediately.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

. Valdes is alternatively spelled "Valdez” in some court documents.

. Valdes, who was tried after Van Poyck, was convicted of first-degree murder and sentenced to death, which we affirmed on direct appeal. Valdes v. State, 626 So.2d 1316, 1318 (Fla.1993). In that case, we observed that "[t]he testimony indicated that Valdes and Van Poyck acted in concert during the entire episode.” Id. at 1324. "On July 17, 1999, inmate Joy Frances ('Frank') Valdes died after having been beaten at Florida State Prison....” Valdes v. Crosby, 390 F.Supp.2d 1084, 1087 (M.D.Fla.2005).

. Van Poyck was also convicted of attempted first-degree murder, armed robbery, aiding in an attempted escape, aggravated assault, and six counts of attempted manslaughter.

. As to the mitigation offered by Van Poyck, the trial judge said:
The defendant presented evidence which attempted to show that he was under the influence of another person to wit; his brother and/or Mr. O'Brien. This Court finds that the evidence was totally lacking to establish in any way that mitigating factor based upon the fact that he clearly had had no contact with his brother for numerous years other than by infrequent letter writing and that he had in fact not seen Mr. O’Brien for a long period of time. Further, the Defendant admitted on the stand that he was operating during the commission of this offense as a person responsible for his own acts and with knowledge of what he was doing.
The only other potential mitigating circumstance for which evidence was presented was that the Defendant, WILLIAM VAN POYCK’s mother died when he was approx *351 imately eighteen (18) months of age. However it was shown that he was subsequently raised in a good family and by people that cared for him. Further the Court would note that Mr. Van Poyck is an individual who is quite intelligent and very knowledgeable as to the law and that he himself admits that he was well aware of the law including felony murder, that he himself was the individual who planned this operation, who retained Mr. Valdefs] to assist him and who checked the guns on the way to the location where this murder occurred to see to it that they were loaded. By all evidence, Mr. Van Poyck was a major participant in this murder.

Id.

. The State presented evidence that Van Poyck was previously convicted of two robberies and one burglary. Id.

. The guilt phase claims were as follows: (1) the trial court erred in not severing the multiple offenses in this case; (2) the evidence was insufficient to support a conviction for first-degree premeditated murder; (3) the evidence was insufficient to support a conviction for attempted first-degree murder; (4) the evidence was insufficient to support a conviction for aiding in an attempted escape; (5) the evidence was insufficient to support the convictions of six counts of attempted manslaughter; and (6) the convictions of the six counts of attempted manslaughter violated the rule of lenity. Id. at 1069.

. Van Poyck’s penalty phase claims were: (1) the trial court failed to properly consider the mitigating evidence; (2) the aggravating circumstance of knowingly creating a great risk of death to many persons is vague, overbroad, and capricious; (3) the trial court erroneously found the aggravating circumstance of knowingly creating a great risk to many persons; (4) the trial court erred in denying Van Poyck’s request for limiting jury instructions on the aggravating circumstance of knowingly creating a great risk of death to many persons; (5) the trial court failed to direct the jury to make a mandatory factual determination concerning Van Poyck’s participation based on Tison v. Arizona 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), and Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); (6) the trial court failed to make factual findings required by Tison and Enmund in its sentencing order; (7) the trial court violated Van Poyck’s right to a fair trial by refusing to excuse pro-death jurors and attempting to exclude jurors opposed to the death penalty; (8) Florida's death penalty statute, as applied, is unconstitutional; (9) the trial court gave Van Poyck insufficient time to obtain adequate medical examinations; (10) the trial court erred with regard to sequestering the jury; (11) the trial court improperly considered Van Poyck’s pri- or convictions; (12) the trial court erred in finding the existence of an aggravating circumstance which duplicated an essential element of felony murder; (13) Van Poyck was denied his right to effective assistance of counsel during the penalty phase; (14) his death sentence is not proportional; and (15) Florida's death penalty statute is unconstitutional. Id. at 1069-70.

. Van Poyck raised the following claims: (1) ineffective assistance of penalty phase counsel; (2) the postconviction court inappropriately limited his ability to prove the ineffective nature of his penalty phase representation; (3) ineffective assistance of guilt phase counsel; (4) a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (5) the great risk to many aggravating circumstance was unconstitutionally vague; (6) the judge and jury weighed the invalid aggravating factors that the murder was premeditated or that Van Poyck was the trigger-man; (7) the prosecutorial argument as well as the jury instructions improperly shifted the burden of proof during the penalty phase proceedings; (8) the trial court improperly denied Van Poyck's challenges for cause during jury selection; (9) Van Poyck’s constitutional rights were violated by the prosecutor’s conduct during trial; (10) the acquittal and affidavit of O'Brien together with the testimony of Turner necessitate a new trial; (11) En-mundJTison errors necessitate a reversal of Van Poyck's death sentence; (12) the consideration, as an aggravating circumstance, of the underlying felony that had already been utilized to convict Van Poyck of felony-murder was improper; (13) the trial court and prosecutor erred in indicating to the jury that sympathy was an inappropriate consideration; (14) the trial court failed to conduct an independent evaluation of the mitigation offered by Van Poyck; (15) the jury instructions given at the penalty phase were vague and confusing; and (16) the trial court committed fundamental error by failing to instruct the jury on justifiable or excusable homicide as part of the instruction on manslaughter.

. The issues certified for appeal were: (1) whether Van Poyck received ineffective assistance of counsel during the penalty phase; (2) whether the trial court erred in denying a continuance between the guilt and penalty phases; (3) whether Van Poyck received ineffective assistance of appellate counsel; (4) *353 whether the trial court failed to properly consider all of the mitigating evidence; (5) whether Van Poyck’s sentence is based on an invalid aggravating factor; and (6) whether the State committed a Brady violation. Id. at 1320.

. In his third habeas petition, Van Poyck claimed that (1) the jury did not make proper findings under Enmund and Tison; and (2) the statute under which he was sentenced to death is unconstitutional under the Sixth Amendment in light of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

. Van Poyck's execution is set for June 12, 2013.

. The affidavit was supplemented by Mrs. Valdes on May 23, 2013. This supplement essentially details the steps Mrs. Valdes took in initiating contact with Van Poyck’s counsel and the circumstances surrounding the composing of the May 16, 2013, affidavit. Mrs. Valdes also states in the supplement that she will testify in court to the contents of her affidavit. As noted above, Frank Valdes died in July 1999.

. In its entirety, Mrs. Valdes' affidavit states:
1.I knew Frank Valdes since he was about fifteen, and ended up marrying him after he was sent to death row. I don’t know and have never met Billy Van Poyck.
2. I told Frank many times I wanted to know what happened when Officer Griffis was killed. Finally some time after we were married Frank Valdes said he would tell me because now I had to do what he told me because I was his wife. He said “You will not tell anybody, you will swear on your kids’ life and your own life that you will not tell anybody what I’m about to tell you.” He said he wanted to be free and get out of there but he wouldn’t if people knew he had shot Officer Griffis.
3. Frank Valdes then said “everybody brags about Billy (Van Poyck) like was the leader of everything and they think he's *355 smarter than me. He was not the leader of me. I did what I wanted to do. No one controls me. I control myself.”
4. Frank Valdes then said "I'm a leader and I’m very forward. I get loud if I don’t get my way. Don’t think for a minute Billy is smarter than me or led anything.” When the two discussed what was going to happen that day Billy said "I don’t want to shoot anybody. I don't want you shooting anybody. I don’t want to go cowboy on this. Nobody’s gonna get hurt in this. I just want to take the keys and get O'Brien out.”
5. Frank Valdes then said to me "I don’t want you to tell anybody what I’m telling you. It can get me killed.” I promised not to tell anyone, but Frank is dead now and I want to be honest. I'm not gonna let someone die and me know the truth.
6. We continued to talk. Frank said he and Billy had both been drinking the night before, and on the way down to break O’Brien out. Frank was also doing cocaine. Frank said he and Billy went up to each side of the van and they each opened a door. Billy took out Officer Turner and Frank took out Officer Griffis. Frank had a gun. Frank asked who has the keys to the van. Officer Griffis says I have them and they were hanging on his finger. As they were walking back Officer Griffis threw the keys into the bushes. Frank was high and had not seen the Officer throw the keys in the bushes. He asked where the keys were and Officer Griffis said "I don’t know.” Frank says you have two seconds to find them but Officer Griffis just stood there and didn't try to look. Frank then told me he shot Officer Griffis in the head, and a couple more times. It made me sick to even hear.
7. After Frank shot Officer Griffis, Billy said "why did you kill him?” Frank said he just laughed. Frank told me he wanted to be in the mafia, and thought he had to kill someone to make it. Frank enjoyed beating and hurting people and had been in a gang.
8. I have never told any lawyer or investigator about what Frank told me about the crime until the past few days. I was scared to death if I told what I knew something would happen to me or my children because Frank still has friends on the outside, and before now, I thought Billy would get a new trial or a life sentence.

. The postconviction court assumed that the allegations contained in Mrs. Valdes' affidavit were true and that the statements made would constitute her direct testimony.

. Likewise, the Eleventh Circuit observed:
During the penalty phase, the witnesses *357 called by the prosecutor only testified about Van Poyck’s past crimes and about the fact that he was on parole when the instant offense was committed. The prosecutor did not present additional evidence suggesting that [Van Poyck] was the triggerman.
Even more telling is the prosecutor’s closing argument. [Van Poyck] being the triggerman played only a very minor role in the prosecutor’s argument. As aggravating factors, the prosecutor advanced these things: 1) that [Van Poyck] was on parole when the crime was committed; 2) that the crime was committed for the purposes of effectuating an escape from prison; 3) that [Van Poyck] knowingly created a great risk of death to many persons; and 4) that [Van Poyck] had previously been convicted of a violent felony. The establishment of these elements did not require arguing that [Van Poyck] was the triggerman. The prosecutor never argued that it had been established beyond a reasonable doubt that [Van Poyck] was the triggerman.
The only time the prosecutor did argue that the evidence tended to show that [Van Poyck] was the triggerman was in rebutting [Van Poyck’s] argument that he was only an accomplice and played only a minor role in the crime. Even in rebutting that argument, however, the prosecutor relied heavily on the idea that, “[r]egardless of who the triggerman is," death would still be appropriate. Rather than focusing the jury on who the triggerman was, the prosecutor stressed that [Van Poyck] could not be considered a minor participant because he had been the one to come up with the idea of breaking O’Brien out of custody and had planned the crime. While the prosecutor did, on a few occasions in his closing argument, say that evidence in the case suggested that [Van Poyck] was the triggerman, the main argument made by the prosecutor was that the death penalty — because of the four aggravating factors and because [Van Poyck] was not a minor participant in the underlying violent felony — was an appropriate sentence for [Van Poyck], regardless of who actually shot Officer Griffis.
Van Poyck III, 290 F.3d at 1325-26 (footnote omitted). In denying Van Poyck's claim that "the trial court committed error by considering, and allowing the jury to consider, that he was the triggerman,” the Eleventh Circuit reasoned:
[W]hether [Van Poyck] was actually the triggerman was of only minimal importance during the prosecutor’s closing [arguments made during the penalty phase]. Never did the prosecutor argue triggerman status as an aggravating factor that would justify the death penalty. And, in rebutting [Van Poyck's] argument that [Van Poyck's] minor role in the crime should be considered a mitigating factor, the prosecutor focused chiefly on [Van Poyck's] role in orchestrating and planning the crime, not on whether [Van Poyck] was the triggerman. The prosecutor's expressed argument was that [Van Poyck] deserved death whether or not [Van Poyck] was the triggerman.
[Van Poyck] also argues that the trial court improperly relied upon his being the triggerman. Again, the Florida Supreme Court’s rejection of these claims was not unreasonable.
The sole indicator that the trial court considered [Van Poyck] to be the trigger-man is a passage in the order imposing the death penalty, in which the trial court stated "the State clearly presented competent and substantial evidence as to the crime of first degree felony murder and/or first degree pre-meditated murder and in reality presented competent evidence that Mr. Van Poyck may have in fact been the individual who pulled the trigger and shot Fred Grif-fis.” The trial court never stated that it found [Van Poyck], in fact, to have been the triggerman or that the court considered [Van Poyck’s] triggerman status to be an aggravating factor justifying the death penalty. The only aggravating factors the trial court found to exist were the four argued by the prosecutor in his closing, and none of those factors is based upon triggerman status.
Id. at 1329-30.

. Van Poyck asserts that Officer Turner’s memory of the events evolved in that he provided four versions of the same events. However, in Van Poyck’s claim on direct appeal that the evidence was insufficient to support his conviction for attempted first-degree murder, Van Poyck made the same attempt to discredit Officer Turner’s testimony. Van Poyck I, 564 So.2d at 1069.

. We note that one of the aggravates found by the sentencing judge was that Van Poyck knowingly created a great risk of death to many persons, a finding which we upheld. See Van Poyck I, 564 So.2d at 1071 ("[W]e conclude that each of the aggravating circumstances found by the trial judge was properly established in this record....”).

. The postconviction court properly granted the State's motion to dismiss Van Poyck’s third successive motion for postconviction relief. See Fla. R.App. P. 9.141(d)(3) ("Petitions alleging ineffective assistance of appellate counsel shall be filed in the appellate court to which the appeal was taken.”).

. As to this issue, the postconviction court stated:
While Mr. Bettman [Van Poyck’s counsel] argues that the Supreme Court has never ruled on this matter, he concedes that he has done nothing to bring this to the attention of the court. This Court assumes the matter was considered by the Supreme *361 Court when they ruled on his habeas petition.

.The ground stated in Lasley’s February 22, 1990, motion for leave to substitute appointed counsel had no relation to any mental infirmities or drug-related issues. The basis of the motion was that Lasley was also appointed to represent a juvenile in a murder trial that was scheduled to begin on March 5, 1990.

. See supra, footnotes 7-8.

. On December 21, 1995, we granted Matthew Lawry’s motion for leave to withdraw.